Nevin v. Ladue.

NEVIN vs. LADUE and another, overseers of the poor, &c.

Ale and strong beer are included in the terms *strong and spirituous liquors* as used in the statute, (1 *R. S.* 680, § 15,) making it penal to sell such liquors by retail without licence. *Per* WALWORTH, *Chancellor.*

But an admission by a party prosecuted under the statute that he had sold " ale, strong beer *or* fermented beer," does not prove him guilty of an offence.

ON error from the supreme court to review a judgment of that court affirming one rendered by the court of common pleas of Putnam county. The facts of the case and the reasons of the judges are stated, *ante, p.* 43.

*W. Fullerton & N. Hill Jr.,* for the plaintiff in error.

*J. A. Collier,* for the defendants in error.

THE CHANCELLOR. The suit in the justice's court against Nevin was for an alleged violation of the statute against selling liquors without a licence. And the principal question for our consideration is whether ale, porter and strong beer, are within the prohibitions of the statute as it existed when this offence is alleged to have been committed. The statute provides that whoever shall sell any strong, or spirituous liquors, or any wines, in any quantity less than five gallons at a time, without having a licence therefor granted as therein directed, shall forfeit twenty-five dollars.

To ascertain whether these malt liquors are included in the term *strong liquors,* it may be necessary to refer to the history of this species of intoxicating beverage, and the previous legislation on the subject both here and in England. The words strong liquors in our statutes were probably intended to include all those strong and inebriating drinks sold and used as beverages which in King James' version of the scriptures are called *strong drink ;* as well as the products of the still. It will be seen by a reference to the French translation of the Bible, that

the Hebrew word which is supposed to mean any kind of fermented intoxicating beverage, and which in our English version is called strong drink, is, in the French translation that I have examined, generally rendered *cervoise*. (*Prot. French Bible, Paris ed. of* 1805, *Lev.* 10, 9 ; *Num.* 28, 7 ; *Prov.* 31, 6 ; *&c.*) And that is the proper French word to designate the ale or beer of the ancients produced by the fermentation of grain in water. (*Wilson's French Dict. Cervoise.*) The Hebrew word used in the scriptures could not have meant distilled or ardent spirit. For the art of distillation was not known to the ancients, but is supposed to have been discovered several hundred years after the commencement of the Christian era, and to have been introduced into England by Friar Bacon about the thirteenth century. There the knowledge of the process of distillation was for a long time confined to the religious houses, and its product was sold and used only as a medicine. But upon the dissolution of the monasteries, shortly before the middle of the sixteenth century, the knowledge of the art became general. I think, however, it had been in common use in Ireland long before the time of Henry the eighth, under the name of *usquebaugh*. But the intoxicating beverage now known as ale, or beer, produced by the fermentation of barley, wheat, and other farinaceous substances, must have been used by the Jews at a very early day ; as it was by other eastern nations. Its use as a beverage was probably known to them while they sojourned in the land of Ham, and before the Pentateuch was written. For beer was in use in Egypt from the most remote antiquity. The learned President De Goguet, in his valuable treatise on the origin and progress of laws, and of the arts, among the most ancient nations, says that next to wine it was the most ancient and universal liquor. It was the common drink of the greatest part of Egypt ; and its invention is exceedingly ancient. (1 *De Goguet, B.* 2, *art.* 3, *p.* 108, *Edinb. ed. of* 1775.) And the discovery of the art of making it, as stated by Diodorus of Sicily, (*Diod. Sic. Lib.* 1,) was there ascribed to Osiris ; who was the Bacchus of the Egyptians. (*Tertullian De Corona, v.* 7, *Oxford ed. of* 1842, *p.* 170. *See also Beloe's Heroditus, Phil. ed. of* 1840, *p.* 95, *n.*)

Beer was sometimes called by the ancients *the Pelusian pota-tion.* (*Wilson's Fr. Dict. art. Beer.*) And they probably gave it that name because they first obtained it from the city of Pelusium, near the mouth of the Nile; where it was made in very great quantities at an early day. (1 *Wilk. Man. & Cust. of the Ancient Egyp. Lond. ed.* 1837, *p.* 172.) We also know from the inspired volume that long before Moses wrote, some of the then dwellers in Canaan knew that the land of Egypt not only shared largely of the bounties of Ceres, but that also, by the providence of Joseph, it was able to supply neighboring nations with grain in a time of famine. And as the vine did not flourish in Egypt, it probably was *oinos kristhinos,* or barley wine, that Joseph gave to his brethren on their second visit to that country to buy corn, when they drank largely and became intoxicated; as the Hebrew text clearly indicates; (*Hunter's Sac. Biog. v.* 2, *p.* 75, 8*th Lond. ed.;*) or, in the language of our translation, " drank and were merry with him." (*Gen.* 43, 34.)

Herodotus, the oldest of the Grecian historians, who wrote nearly five hundred years before the commencement of the Christian era, and who travelled over Egypt and Italy as well as Greece, says the Egyptians used a liquor drawn from barley by fermentation. (*Beloe's Herodotus, Book* 2, § 77, *p.* 95.) Athenæus, in his Feast of the Sophists, also cites Aristotle, the tutor of Alexander the Great, to show the intoxicating effects of beer among the Egyptians in his day; and that those who got drunk on it invariably lay upon their backs, while those who got intoxicated upon wine always lay upon their faces. (*Athen. Deipnosophishæ, Lib.* 1, *p.* 16, *C. p.* 34, *B. and Lib.* 10 *p.* 418, *E. Lond. ed. of* 1612.) Beer was not only in general use in Egypt long previous to the time of Herodotus, but it had found its way into other countries also; or at least it was known in them at a much earlier period. It was known to Archilochus, the Grecian poet and satirist, who flourished about the time of the last of the decennial archons, and near the end of the reign of the good King Hezekiah, seven hundred years before the Christian era.

For he, as well as Sophocles the tragedian, who wrote three hundred years later, calls this liquor *wine of barley*.

Dr. Robinson, in his Hebrew Lexicon, refers to Herodotus and also to Diodorus of Sicily, to show that the word *shekar* usually translated strong drink in King James' version of the Bible, means any inebriating liquor; and includes ale or beer. He also refers to St. Jerome to show that it includes mead or metheglin, an intoxicating beverage also well known to the ancients, and sometimes called by them wine of honey. And he might have added that in Jerome's time the word *sikera*, from the Hebrew sh*a*kar, to get drunk, was used to designate any kind of inebriating drink; whether made from grain, honey, juice of apples, dates or other fruits. (*See Parkhurst's Hebrew Lexicon, p.* 827, *and also Hieron. Epist. ad Nepotianum De-vita Clericorum.*) It may be that the word *chica*, which was used by the aborigines of this continent, as the name of an intoxicating beverage found among them at a very early day, produced by the fermentation of maize or Indian corn, was derived from the same Hebrew root. Acosta, in his Natural History of the Indies, written in the sixteenth century, and Frezier, in the account of his voyage to the South sea, and the coast of Chili and Peru, about 1713, and other voyagers of that day, give the name, and the disgusting mode of preparing that kind of beer among the Indians; in which the saliva of the females answered the purpose of barm in producing the vinous fermentation. (*See Acosta Hist. Nat. des Indes, Paris ed. of* 1598, *p.* 161; *Voyage de Frezier, Paris ed. of* 1716, *p.* 62; *Dampier's Voyage to the Bay of Campeachy, Lond. ed. of* 1700, *p.* 113.) De Lery, who visited America more than a century before Frezier and Dampier, also refers to the same custom. (*See Voyage de J. De Lery, Paris ed. of* 1580, *p.* 124.) Indeed we learn from Garcilasso de la Vega's History of the Incas of Peru, that an intoxicating beer, produced by the fermentation of grain, was in use among the Peruvians long before they were first visited by the Europeans. And they probably brought the knowledge of the art of making it with them, at that unascertained period of time when adventure or accident first brought them to this

continent. (*Hist. des Incas, tome 2, Par. ed. of 1744, p.* 196.) The Abbe Molina, in his history of Chili, states the fact that the aborigines of that country, in burying their dead deposited, in the mound with them vessels filled with *chica* or beer, to subsist the deceased on his passage to the other world. (*Hist. of Chili, vol. 2, p.* 81, *Middletown ed. of* 1808.) And it is worthy of remark that some of the earthen jars found in the Chilian and Peruvian burial places were similar in form and appearance, to those which Lane says he saw in the tombs at the necropolis of ancient Thebes; and which contained the dregs of beer. (*See Lane's Modern Egyptians, vol. 2, p.* 34.)

Xenophon, who wrote between three and four hundred years before the Christian era, shows that beer was then in use among the Armenians upon the borders of Kurdistan. In describing the retreat of the ten thousand Greeks, after the battle of Cunaxa, he makes mention of a fermented liquor, prepared from grain, which the inhabitants of that country, through which they passed, like the more refined tipplers of the present day, sucked through a reed or hollow tube. The passage in Xenophon is thus translated. " There was also wheat, barley and legumens; and beer in jars in which the malt itself floated even with the brims of the vessels; and with it, reeds, some large and others small without joints. These, when any one was dry he was to take in his mouth and suck. The liquor was very strong when unmixed with water," &c. (*See Cooper's Xen. Phil. ed. of* 1845, *p.* 246, &c.) The elder Pliny, who must have written shortly after the middle of the first century, as he perished at the eruption of Vesuvius which destroyed Herculaneum in seventy-nine, notices the intoxicating drinks which were in use among the different nations of his day. He says, the drinks of the Egyptians were manufactured from grain steeped in water: and that a similar liquor was used by the several nations who inhabited the west of Europe, with which they intoxicated themselves. He notices the fact that the manner of making the liquor was somewhat dissimilar in Gaul, Spain and other countries; and that the people of Spain in particular brewed the liquor so well that it kept good for a long time. It was called

by different names, but its nature and properties were the same in all the nations where it was in use. And to show that even then it was considered a curse instead of a benefit to mankind, he remarks that so exquisite is the ingenuity of mankind in gratifying their vicious appetites, that they have invented a method to make water itself intoxicate. (*Plin. Nat. Hist. Book* 4, §§ 12, 22; *B.* 14, § 19.) Tacitus also, in describing the manners and customs of the Germans in his day, notices their drunken broils from the excessive use of beer. (*See Murphy's Tacit. De Mor. German.* §§ 22, 23, *Phil. ed. of* 1842, *p.* 552; and *Diod. Sic. Lib.* 5, *p.* 350, *Amsterdam ed.* 1745.) Perhaps the people of Spain had as early as Pliny's time discovered the antiseptic property of hops when mixed with ale or beer; although hops were not used in brewing in England until some centuries later. That the art of malting was in use before the Christian era may be inferred from *Ovid.* He describes the meeting of Ceres, when exhausted and weary, with an old woman, and when she requested water of her, the latter presented the goddess with some of this inebriating product of her own bounty; a liquor manufactured from dried grain. (*Ovid Met. Lib.* 1.) The story is thus translated:

> " The Goddess knocking at the little door,
> 'T was opened by a woman, old and poor;
> Who when she asked for water, gave her ale,
> Brewed long, but well preserved from being stale."

At what time beer was first introduced into England, is uncertain; but it was probably in use there very soon after the discovery of that country by the Romans, if not before. For according to Morewood, Dioscordes, who wrote in the time of Nero, records the fact that the British and Irish then used an inebriating liquor called *curmi*, made from barley. Morewood also states that the manner of making ale or beer by the ancient Britons and other Celtic nations, is thus described by Isodorus, and by Orosius who was a disciple of St. Augustin. "The grain was steeped in water and made to germinate, by which its spirits were excited and set at liberty; and it was then dried and ground; after which it was infused in a certain quantity of

Nevin v. Ladue.

water, and being fermented, it became a pleasant, warming, strengthening and intoxicating beverage." (*Morew. Hist.* 530.) This liquor was called by the people of Spain *celia*, and *ceria*. The Britons, as we have seen, called it *curmi*. And in Germany and Gaul, as well as among the Romans, it was called *cerevisia;* from *Ceres*, the goddess of grain, and *vis*, power or strength. Its proper name in the English language, therefore, is strong liquor, or strong drink. Buckhardt, Salt, Bruce and other modern travellers in Egypt, Nubia, Abyssinia, &c. mention a similar liquor still in use in those countries under the name of *bouza;* which is made by fermenting barley and other farinaceous substances with water, but without malting the grain; which makes a strong and inebriating drink, and is in extensive use. And an evidence of its intoxicating qualities is the fact stated by one of those writers, that it is used sometimes to catch monkeys; who like the bipeds they are so apt to imitate are inclined to partake of the pleasures of the inebriating cup, without duly considering the consequences. To effect his object, the monkey-catcher places a vessel filled with *bouza* at the foot of the tree on which the animals are gamboling, and then watches at a distance until they come down and regale themselves to intoxication. And we, who have seen the effect of similar proceedings elsewhere, can readily imagine what is the inevitable result of this stratagem to the *bouzy* monkeys.

The regulation of ale houses and victualling houses in England claimed the attention of the government at a very early day, and long before the art of distillation was known there. For in the latter part of the tenth century King Edgar put down all ale houses except one in each borough or small town. The statutes of 5 *and* 6 *Edward* 6, *ch.* 25; 1 *James* 1, *ch.* 9; 4 *James* 1, *ch.* 5; 21 *James* 1, *ch.* 7; *and* 1 *Charles* 1, *ch.* 4; (7 *Evans Stat.* 1, 3, 5, 7, 9;) which were subsequently passed to regulate ale houses and tippling houses, all related merely to the retailing of ale, beer, wine, ardent spirit, and other intoxicating beverages sold at such houses to be drank therein, and not to the manufacture or sale of such liquors to be used elsewhere. Nor was there any revenue or excise duty raised upon the

Nevin v. Ladue.

granting of licences to such houses. Those regulations and restrictions, however, applied to the sale of every kind of intoxicating beverage which was sold at such taverns, or tippling houses. But so far as related to the making and vending of ale or beer generally, there was no restriction. Nor was there any duty imposed thereon until about the middle of the 17th century. Both before and since that time, there were not only common brewers, who made such liquors for sale to others, but many of the inhabitants had brewing materials and manufactured the liquor for their own consumption. Morewood says, it is a common practice in Staffordshire, Shropshire and Warwickshire, as well as in the midland counties, for women to brew; that many of them follow it as a livelihood, going from house to house as the wants or calls of the victuallers require, that this has been the practice for centuries; hence the term *alewives* as recorded in some of the old statutes. (*Morewood*, 543.) The term as used in an early statute of Massachusetts, referred to by the counsel for the defendants in error upon the argument however, did not refer to this class of brewing dames, but to their namesakes the herring; who probably derived their cognomen either from the redness of their gills, or from their attachment to ale or strong beer. Most likely the latter; for I see by a statute passed in the time of Cromwell, (*Scobell's Stat.* 458,) that this intoxicating beverage has sometimes been used for the enticement of herring and some other fish into difficulty, as well as men and monkeys.

In 1643, a tax was laid for one year upon ale and beer brewed by a common brewer, or by any private person who should sell or tap out such ale or beer, either publicly or privately ; which tax upon home manufactured articles was called by the new name of *excise*, as the duty upon the importation of articles from abroad was called an impost. This excise was continued from time to time by the Cromwellian parliaments until the statute of 1656, chapter 19, to which I have before referred; which appears to have been unlimited, and to have continued in force until the restoration. By that statute, the general principles of which seem to have been afterwards adhered to in England, a

distinction was made between ale or beer of a particular strength and value, subsequently called strong beer, or porter, and beer of a less value which assumed the name of small or table beer; both of which, however, were strong and intoxicating liquors. The excise upon the one, when brewed by a common brewer, or by any other person for sale, was fixed at two and six pence, and upon the other at six pence the barrel; and in the same proportion for a greater or less quantity. In the same statute an excise duty of two pence a gallon was imposed upon *aqua vitæ*, or *strong waters*, distilled within the commonwealth. A duty of two and six pence a hogshead was also imposed upon cider and perry, made and sold by retail; and a penny a gallon on mead and metheglin and such like drinks, thus made and sold. And the act concludes with a proviso, to which I have before alluded, that the excise duty thereby imposed shall not extend to salt used in salting herrings, &c., or to *beer used for taking them*. (*Scob. Stat.* 452.) Immediately after the restoration the same excise duty was granted to Charles the second and his successors; and this excise duty was farmed out during his life. (*Stat.* 12 *Charles* 2, *ch.* 8.) After his death the excise duty was continued to his successors, with various modifications from time to time, until 1830; when the excise upon cider and perry was abolished. But I believe the excise duty upon all the other intoxicating beverages manufactured for sale, including mead and metheglin, still continues in England. At the union in 1707, the English excise duties on beer, &c. were extended to Scotland; and a malt liquor of intermediate strength, in use there, called two penny ale, was also provided for.

It will be seen that these were mere revenue laws, as the earlier laws of this state were, and had no necessary connection with the vending of intoxicating beverages by the keepers of ale-houses and other houses of public entertainment; which houses also were regulated by particular statutes from time to time. The first colonial act which I have been able to find, fixing an excise duty upon inebriating liquors here, is the act of October, 1713, entitled "an act for laying an excise on all strong liquors retailed in this colony." (*Bradf. Laws*, 179; 1

*Smith & Liv.* 94.) A previous act, however, had been passed in June, 1709, entitled " an act for laying an excise on all liquors retailed in this colony, for one year ;" which act was replaced by another passed the next year. That was continued by the act of July, 1711, and subsequently expired by its own limitation ; when its place was supplied by the act of October, 1713, which was renewed from time to time until the revolution. (*See* 1 *Smith & Liv. Laws,* 78, 82, 85, 93, 204, 312; *and* 2 *Idem,* 497.) By the first section of this colonial act of 1713, an excise is granted upon all *strong liquors* retailed throughout the colony, under the quantity of five gallons, beer and cider only excepted, of one-eighth of a Spanish milled dollar, or a York shilling for each gallon so retailed, and three quarters of a dollar for every barrel of beer or cider. The act then provides for farming out the excise and licensing the retailers, and for the payment of the duty by them. And the sixth section provides that if any person not duly licenced, shall at any time presume to sell by retail any strong liquors, that is, any quantity less than five gallons as aforesaid, the person or persons so offending shall pay the sum of £5 current money aforesaid, for every such offence.

Even if I had not before shown by the review of the history of this inebriating drink, and the duties imposed thereon in England previous to 1713, that the words *strong liquors* would include all intoxicating drinks, and particularly beer produced by the fermentation of malted grain, it is evident from the language of this act of October, 1713, that ale and beer must have been included within its provisions. For in the first section, beer and cider are covered by the general term strong liquors upon which the excise is laid, and are afterwards excepted for the mere purpose of fixing a lower rate of duty upon the retailing of those two articles. And if they are not embraced in the general term strong liquors in the subsequent sections of the act, the legislature was guilty of the absurdity of imposing an excise duty of six shillings currency a barrel upon beer and cider sold by retail, without making any provision whatever for the col

Nevin v. Ladue.

lection of such duty, or for punishing those who sold without being licenced to sell either of those dutiable articles.

In the revision of the statutes, soon after the close of the revolution, the excise is changed from a specific duty upon the quantity of liquor sold, to an equitable sum to be fixed by the commissioners of excise, for permission to retail intoxicating liquors under five gallons. And provisions are also inserted in that act for regulating inns and taverns where liquor is sold to be drank there, as had been done in relation to the ale-houses and victualling houses in England; and requiring a special licence for that purpose, beyond the ordinary permit granted to etailers who did not sell liquors to be drank on their premises. In this revised act of March, 1788, the language is somewhat changed from that of the act of 1713. For the act of 1788 uses the words spirituous liquors as well as strong liquors. And it prohibits the sale by retail of any strong or spirituous liquors, to be drank or used anywhere, without a permit, or to be drank at the place of sale without a tavern licence, &c. Here again, however, the legislature have used other terms showing that the act was intended to have the same extensive signification as the colonial act of 1713, for which it was a substitute; terms which clearly indicate that the legislature intended to include all kinds of strong or fermented inebriating drinks, as well as ardent spirits, within its general provisions. For the tenth section, which prohibits the sale of strong or spirituous liquors without a permit or tavern licence, excepts metheglin, currant wine, cherry wine and cider, from this general prohibition, when those particular kinds of strong liquors are made by the person selling the same, and where they are not to be drank at the place of sale; but leaves the general prohibition to extend to that class of liquors, as well as all other intoxicating drinks, where the sale does not come within the special terms of the proviso to the tenth section. (See 2 Greenl. Laws, 118, § 10.) Under the statute of March, 1788, therefore, the vendor of these excepted articles was liable to the penalty of £10, if he sold them by retail to be drank at the place of sale without having a tavern licence; or if he sold them by retail to be used elsewhere with-

out a licence or permit; provided he was not the manufacturer of the article sold.

The provisions of the revised act of April, 1801, were the same, in reference to the question now under consideration, as those of the act of 1788; and were continued in force until the revision of 1830. The provisions of the revised statutes are the same, with one or two immaterial exceptions, so far as they have a bearing upon the question before us. In some of the sections of the revised statutes, the revisers and the legislature have added the word *wines* to the prohibitory words of the statute, and also in the sections declaring the penalties for violations of the act; thus prohibiting the sale of wines in express terms, whereas it was before only prohibited in general terms with all other strong or spirituous liquors. But the statute still contains a section exempting, not only the sale of currant and cherry wine, but also metheglin and cider, from the penalties imposed upon the sale thereof by the general provisions of the act, for selling any strong or spirituous liquors or wines by retail, without a permit or licence. (1 *R. S.* 682, § 26.) This again shows that the legislature understood strong liquors produced by fermentation, as well as those which are the product of distillation, to be within the general provisions of the act. For if it were otherwise, it was useless to continue this exception as to metheglin and cider. Nor was this section inserted without due and careful consideration by the legislature, as well as by the revisers. For by a reference to the notes of the latter to this section, and the section itself as originally drawn by them, it will be seen that the revisers only proposed to alter the section from what it was before, so far as to let any person sell these excepted strong liquors by retail, although they were to be drank at the place of sale; provided he was the maker of the inebriating liquors embraced in this section. They therefore framed a section, which was afterwards amended and passed as the 25th, accordingly. And they added a note stating that they had altered the qualification of the exception in the previous statute, so far as to omit the clause which prohibited the excepted liquors from being drank at the place of sale. (*Revs. Rep. of ch.* 20,

*tit.* 9, § 25, *p.* 122.) But the legislature struck out the concluding words "made by him" from that section as drawn by the revisers; so as to except all sales of metheglin, currant wine, cherry wine or cider, from the general prohibitions of the statute against retailing any strong or spirituous liquors or wines without a licence. Under the provisions of the revised statutes as adopted, therefore, any person was authorized to retail the four kinds of inebriating fermented liquors excepted from the operation of the statute by this twenty-sixth section, anywhere and under all circumstances.

The term *strong waters*, as used in Cromwell's statute to which I have before referred, and in the statute 26 *Geo.* 2, *ch.* 31, which was cited on the argument, was a technical term used for some time after the introduction of the art of distillation into England, in the same sense as *aqua vitæ*, to designate that clear and colorless fluid, resembling limpid water, produced by distillation only. And it was entirely different in its meaning from the term strong drink, as used in King James' translation of the Bible, and from the term *strong liquor*, as used in the colonial act of 1713, and other subsequent statutes, to denote any intoxicating beverage, produced either by fermentation or distillation. I have, therefore, no doubt that the revised statutes prohibited the selling by retail of ale and porter, and every other kind of beer which was subject to the excise duty under the statutes in England, and under the colonial act of 1713. And if the plaintiff in error admitted that he had been guilty of such an offence, the judgment of the justice was right and was properly affirmed by the supreme court. That question remains to be considered.

The declaration before the justice was a general one, under the provisions of the revised statutes on that subject; (2 *R. S.* 482, § 10;) claiming $25 of debt, which had accrued to the plaintiffs, as overseers of the poor, under the section of the statute distinctly referred to in such declaration. No action could have accrued to them, according to the provisions of that section, unless the defendant had been guilty of selling strong or spirituous liquors or wines under five gallons at a time, without a

license therefor. Neither he nor the justice, therefore, at the time of the trial, could suppose from the charge then distinctly made against the defendant, that he had sold either ale or strong beer, *or fermented beer,* without a license, that he was not charged with selling such liquor at retail, or under five gallons. An admission of the charge, therefore, but claiming that it was not prohibited by statute, was an admission that he had sold some one of the three articles mentioned, by retail and without license; and so it was the duty of the justice to construe the admission under those circumstances.

If there was any thing in this case from which I could legitimately conclude that the defendant Nevin must have understood the term fermented beer to have been used by the plaintiffs in the same sense as the words ale and strong beer, or in the ordinary sense in which the word beer is used to denote an inebriating beverage produced by fermentation from grain or malt, I should have no hesitation in affirming the decision of the court below. But the term *fermented* beer, in the connection in which it was used before the justice, might well have been understood by Nevin as intended to cover a charge of selling some of the various kinds of beer which have long been in use in this country under the different names of spruce beer, spring beer ginger beer, molasses beer, &c. Each of these may very properly be termed fermented beer, as fermentation to a certain extent is necessary to fit the article for use. What was denominated small, or table beer, in England was a different article from any of these; and was an excisable liquor, under the general name of beer. For it differed from porter only in its strength; and being sold at a smaller price it was for that reason charged with a lower rate of duty under the English statutes. But the other kinds of beer to which I have alluded, were never considered as strong liquors, or intoxicating beverages, either here or in England; and therefore were not excisable articles. They do indeed contain a certain amount of alcohol, as every liquid containing saccharine matter does, immediately after the vinous fermentation has commenced. But they have not been considered as strong drinks, or intoxicating beverages; either because

Nevin *v.* Ladue.

it was supposed that the human stomach had not capacity to contain a sufficient quantity of those kinds of beer, if they were properly made, to unduly or injuriously excite the person who used them as a beverage; or for the reason that those who were in the habit of using them never got intoxicated by such use.

In penal actions, where the plaintiff seeks to charge the adverse party with a penalty or forfeiture, he is held to more strictness than in ordinary suits. For the reason therefore that the plaintiffs in the suit before the justice did not state their case with sufficient clearness to show that a violation of the statute had been committed by the defendant, though they probably supposed they had made out a proper case by his admission, I think the justice should have required other or further proof of the commission of an offence before he gave judgment against the defendant for the penalty.

On this ground alone I shall vote for a reversal of the judgment.

BARLOW, SPENCER and WRIGHT, Senators, delivered written opinions for reversal, in which they maintained that the question whether *ale* or *strong beer* were within the prohibitions of the excise laws did not arise in the case; it not being shewn, as they construed the return, that the defendant had sold such liquors by retail.

On the question being put, "Shall this judgment be reversed?" the members of the court voted as follows:

*For reversal:* The CHANCELLOR, and *Senators* BARLOW, BEEKMAN, BURNHAM, DENNISTON, DEYO, JOHNSON, JONES, LOTT, PORTER, SANFORD, J. B. SMITH, S. SMITH, SPENCER, VAN SCHOONHOVEN, WHEELER and WRIGHT—17.

*For affirmance:* *Senators* EMMONS and WILLIAMS.

Judgment reversed.