## State *v.* Biddle.

### *Intoxicating Liquors—Ale and Cider.*

Whether ale and cider, after the process of fermentation is completed, are intoxicating liquors, within the meaning of Gen. Stats., chap. 99, which forbids the sale of intoxicating liquors except as therein provided, is a question of fact for the jury.

Indictment against Baruch Biddle, for keeping two gallons of intoxicating liquors for sale, at Concord, on August 10, 1873. The defendant admitted that he, at the time and place specified, kept for sale ale and cider, but nothing stronger. The court ruled that ale and cider, after fermentation is completed, are intoxicating liquors, without proof of the amount of alcohol which they may contain; and the defendant excepted. Verdict, guilty; and the questions of law were reserved.

*Attorney-General* and *Solicitor,* for the state.

*Marshall & Chase,* for the defendant.

LADD, J.   Whether ale and cider are intoxicating liquors depends upon whether or not those beverages, being drank, produce intoxication.   That is, the question is as to the effect those liquors produce upon the human system when taken into the stomach.   In chemistry, two inorganic substances are brought together, and the result noted.   This is called an experiment.   The result, which is nothing more than a manifestation of a law of nature, under certain conditions, is a fact.   By the careful and patient observation of a great number of experiments of this sort, a great number of facts are obtained.   The wonderful forces that lie concealed in inanimate matter are thus brought to light, and with the discovery of each new fact the elements are brought more and more into subjection to the will of man, and turned to his use.   Courts, charged with administering the municipal law, do not generally undertake to determine these facts of science, notwithstanding they may be universal, and may rest upon the laws of nature, which are at once universal and immutable.   Experts are brought in for that purpose, and the testimony of experts is addressed to the jury.

So, in the science of medicine: *a priori*, the effect of a given substance, when taken into the stomach, could hardly be foretold, I suppose, by the simple exercise of reason.   The knowledge of the physician, as well as the chemist, comes largely from experiment.   The physician must know, not only the effect which inorganic simples produce, one upon another, but also what effect they may be expected to produce upon the organism of his patient.   Whether ale or cider produces intoxication may be learned in the same way, that is, by experiment.   Any person, who has seen and observed a number of such experiments, may, as a witness, state the result of his observation to the jury.   Any person who has performed the experiment himself may also testify to the knowledge gained in that way; but the witness in both cases is doing nothing more than stating a fact.   The question is, fundamentally, a question of fact, and there is no conceivable view in which anything else can be made of it.

There are undoubtedly laws of nature, the existence and operation of which courts, as well as other persons endowed with ordinary intelligence, assume.   Some of the laws of light, some of the laws of heat, some of the laws that govern falling bodies in their descent to the earth, some of the laws of hydraulics, are matters of such constant observation, experience, and knowledge, that no one would think of requiring them to be proved.   Such knowledge on the part of the jury is assumed, in the same way as it is assumed that they possess consciousness, memory, and reason.   Yet such common knowledge does not convert what is essentially matter of fact into matter of law.   The moment we go beyond the range of common experience and common knowledge in our investigation of any of the laws of nature, we enter the domain of science; all the difference is, that, while one set of facts is known and acted on by all men, the other may be known only to a few who have devoted much time and study to that particular subject.

If it were known with absolute certainty that all fermented ale and

cider invariably produce intoxication, it would still remain *a fact* that they are intoxicating liquors, just as much as though the matter were in dispute and the evidence conflicting. Does a fact, ascertained to be universally true, thereupon become part of the law of the land?

In *Nevin* v. *Ladue*, 3 Den. 437, Chancellor WALWORTH, to show that ale was within the terms of a statute of New York prohibiting the sale of "strong or spirituous liquors" at retail without a license, examines the history of that beverage from the remotest antiquity. He shows that it was in universal use among the Egyptians in the earliest times, its invention being ascribed to Osiris, the Bacchus of that ancient people, and holds that the "strong drink" spoken of in the Scriptures was a liquor produced by the fermentation of grain in water, and that, as the vine did not flourish in Egypt, it probably was *oinos kristhinos*, or barley wine, that Joseph gave to his brethren on their second visit to that country to buy corn, when they drank largely and became intoxicated, as the Hebrew text clearly indicates; or, in the language of our translation, drank and were merry with him. He quotes Herodotus and Xenophon, Tacitus and Diodorus Siculus, Tertullian and Ovid, the learned President DeGoguet and Pliny, Hebrew lexicons, French lexicons, encyclopædias, books of history, books of travel, books of science. "At what time beer was first introduced into England," he tells us, "is uncertain; but it was probably in use there very soon after the discovery of that country by the Romans, if not before; for, according to Morewood, Dioscordes, who wrote in the time of Nero, records the fact that the British and Irish then used an inebriating liquor called *curmi*, made from barley. Morewood also states that the manner of making ale or beer by the ancient Britons and other Celtic nations is thus described by Isodorus, and by Orosius, who was a disciple of St. Augustine: 'The grain was steeped in water and made to germinate, by which its spirits were excited and set at liberty, and it was then dried and ground, after which it was infused in a certain quantity of water, and, being fermented, it became a pleasant, warming, strengthening, and intoxicating beverage.'

"This liquor," the learned chancellor continues, "was called by the people of Spain *celia* or *ceria*. The Britons, as we have seen, called it *curmi*; and in Germany and Gaul, as well as among the Romans, it was called *cerevisia*,—from *Ceres*, the goddess of grain, and *vis*, power or strength. Its proper name in the English language, therefore, is strong liquor or strong drink. Buckhardt, Salt, Bruce, and other modern travellers in Egypt, Nubia, Abyssinia, &c., mention a similar liquor still in use in those countries, under the name of *bouza*, which is made by fermenting barley and other farinaceous substances with water, but without malting the grain, which makes a strong and inebriating drink, and is in extensive use; and an evidence of its intoxicating qualities is the fact stated by one of those writers, that it is sometimes used to catch monkeys, who, like the bipeds they are so apt to imitate, are inclined to partake of the pleasures of the inebriating cup without duly considering the consequences. To effect his,

object, the monkey-catcher places a vessel filled with *bouza* at the foot of the tree on which the animals are gambolling, and then watches at a distance until they come down and regale themselves to intoxication: and we, who have seen the effect of similar proceedings elsewhere, can readily imagine what is the inevitable result of this stratagem to the *bouzy* monkeys."

The result of the learned chancellor's very entertaining and instructive discussion is to show that for many hundred years and in many different countries a liquor, similar to ale, made by fermenting grain with water, has been known and used; that it has been spoken of by many writers, sacred and profane, as strong drink, barley wine, etc., and that its effects have always been described as inebriating. The evidence thus laboriously collected would doubtless go far to satisfy a candid mind that ale is, in point of fact, an intoxicating liquor ; or, at least, that it has been observed to produce that effect on men, as well as monkeys, by a great number of intelligent and veracious writers, during a period which covers a large portion of the known history of the world. If the question were simply whether ale is intoxicating, it would doubtless strike one as sufficiently ludicrous that the books should be ransacked for two or three thousand years back to obtain evidence by which to determine the point, or that hearsay evidence of an experiment performed upon a monkey with a liquor somewhat resembling ale should be sought out and considered, when direct evidence of the effect of real ale upon a man must have been easy of attainment, even in New York. Of course, no such thing was in the mind of the learned judge who delivered this somewhat facetious opinion. The object of the discussion was, to show that, by the true construction of the statute, the sale of ale came within its prohibition. Still, it seems to me the conclusion is nothing less than this : that because ale, or a fermented liquor resembling it, has always and universally been understood to be intoxicating, that *fact* has, therefore, become incorporated into the municipal law of the state; and to this conclusion I cannot agree. If the legislature had intended, absolutely, to prohibit the sale of ale, leaving no question as to its intoxicating qualities to be settled by anybody, it was easy for them to have said so in a single word. What they did was to prohibit the sale of all intoxicating liquors, leaving it to be determined, in some way, by the tribunal charged with administering the law, whether the particular case comes within the general terms of the prohibition. Where is the legal test with which the court are to determine the question ? Suppose here are twenty different kinds of liquor, each containing a different percentage of alcohol, from one to twenty : what is the shape of the legal formula with which the court are to draw the line between that which is intoxicating and so within the legislative prohibition, and that which is not intoxicating and so without the prohibition ? The truth is, the question is essentially one of fact, and I, for one, see no reason why a fact so obvious or well known as to require little or no proof should be withdrawn from the jury and settled by the court as law, any more than

one less obvious, with respect to which the evidence may be doubtful or conflicting.

The terms of the ruling in the present case give special prominence to the process of fermentation. Indeed, they seem to imply that the completion of that process is the criterion whereby to determine whether the liquor is intoxicating or not. In point of fact, this may be so. But it is difficult to see how anything is thereby gained, unless it be first ascertained with certainty that fermentation always produces intoxicating liquor. It is plain that if one fermented liquor is intoxicating and another not, we are no nearer a legal solution of the matter, when we are informed that the particular cider or ale in question is fermented, than we were before. The ultimate question, Is ale or cider intoxicating liquor? still remains unanswered. As to the effect of fermentation, we have the excellent authority of the learned chancellor, from whose opinion I have already quoted so much at length. He says,—"But the term *fermented* beer, in the connection in which it was used before the justice, might well have been understood by Nevin as intended to cover a charge of selling some of the various kinds of beer which have long been in use in this country under the different names of spruce beer, spring beer, ginger beer, molasses beer, etc. Each of these may very properly be termed fermented beer, as fermentation to a certain extent is necessary to fit the article for use. What was denominated small or table beer in England was a different article from any of these, and was an excisable liquor under the general name of beer. For it differed from porter only in its strength; and being sold at a smaller price, it was for that reason charged with a lower rate of duty under the English statutes. But the other kinds of beer to which I have alluded were never considered as strong liquors, or intoxicating beverages, either here or in England, and therefore were not excisable articles. They do indeed contain a certain amount of alcohol, as every liquid containing saccharine matter does, immediately after the vinous fermentation has commenced. But they have not been considered as strong drinks or intoxicating beverages, either because it was supposed that the human stomach had not capacity to contain a sufficient quantity of those kinds of beer, if they were properly made, to unduly or injuriously excite the person who used them as a beverage, or for the reason that those who were in the habit of using them never got intoxicated by such use." In *State* v. *Adams*, 51 N. H. 568, SMITH, J., states the scientific fact that alcohol may be obtained by distillation from fermented milk.

Upon this authority it is safe enough to say that neither fermentation nor the presence of alcohol can be adopted as an absolute legal test to determine whether any liquid is intoxicating or not, inasmuch as there are fermented liquors containing alcohol, which, like milk, do not inebriate.

Our statute, by using the word spirituous, forbids the sale and keeping for sale of certain specified liquors, that is, such as are obtained by distillation. The generic term, intoxicating, also found in the statute,

is of much broader signification. It is true, the provision found in section 24 of the liquor law, to the effect that nothing in the act shall be construed to prevent the sale or keeping for sale of domestic wine or cider unmixed with spirituous liquor, except when sold to be drunk on or about the premises where sold, implies an understanding on the part of the legislature that cider might come within the general prohibition of the act; but they carefully refrained from mentioning that beverage by name, and thus left it with the large class of liquids, such as wine, ale, porter, beer, etc., known to contain more or less alcohol, prohibited or not according to the fact of its intoxicating quality.

We are of opinion that as to all liquors except those specially designated by the term "spirituous," before the act can be applied to them, it must be ascertained in a legal way that they come within the definition. This, as already more than once remarked, is clearly an unmixed question of fact, and we see no ground upon which it can legally be determined, as matter of law, by the court. We are therefore of opinion that the ruling was erroneous, and that the verdict

*Must be set aside.*